Thank you, Your Honor. Good afternoon, and may it please the court. I am Jennifer Garcia, and with me at council table is Dale Bache. We are from the Federal Defender's Office for the District of Arizona, and we represent the petitioner-appellant in this matter, Mr. Runneagle. This case is back before the court following... He wasn't represented by the Public Defender's Office at the trial, was he? No, Your Honor. The co-defendant was represented by the Maricopa County Public Defender's Office, and Mr. Runneagle was represented by a contract lawyer who was in private practice. How were they selected? I think the process has changed significantly over the years, but at the time... I mean at that time. At that time. I believe there was an application to fill out where you could get appointed to felony cases, and once you had filled out that application and been approved for the contract system, you could be appointed to cases. And how about death penalty cases? At the time, most of the death penalty cases, I believe, were handled by the Public Defender's Office, but for those cases where that office had a conflict, they went to the lawyers who had the felony contracts. Well, did they go to lawyers who had experience in death penalty cases? Sometimes they did, Your Honor, but not in all cases. I think in this case, Mr. Runneagle's case was Mr. Iniguez's first death penalty case, but he did have a second one shortly thereafter in the Aaron Williams case, which is another case that has been before this Court a few years ago. Okay. I'd just like to see how things run. No, that's fine, Your Honor. We're back before this Court following a limited remand due to Martinez v. Ryan and the effect that it had on some of Mr. Runneagle's defaulted IAC claims that had been previously found defaulted by the District Court in this case. If the Court agrees, I'd like to focus on two main issues today. First, the District Court's finding that Martinez does not apply to cases like those of Mr. Runneagle, where the appellate and post-conviction process took place a little bit differently in the late 80s and early 90s. And second, his claim regarding his post-conviction counsel and his trial counsel and their ineffective assistance regarding his claim of ineffectiveness at sentencing. You're not going to discuss his ineffective assistance of claim counsel regarding to counsel or his ability to inculpate Tilden? I had planned to, unless the Court has questions. If you have questions, I'd be happy to answer them. Okay. First, regarding the finding that Martinez doesn't apply to cases like Mr. Runneagle's, looking at the big picture here, this is a complicated case with a complicated procedural history, and I really think an important focus here is the purpose of Martinez and Trevino. And the Supreme Court was very clear in deciding these cases that the underlying principle was the right to counsel and that there had to be a way for petitioners like Mr. Runneagle, when there was a proceeding which was their only opportunity to raise a certain claim, that they either had to have a constitutional right to effective assistance in that proceeding or an equitable right. Here, there's nothing that's any different about this case than the other cases where the United States Supreme Court has argued. Are we talking about the unique Arizona procedure, about how they stay the direct appeal pending the habeas? Yes, Your Honor. That's what we're talking about now? Yes. Okay. I'll just tell you, I for one, I believe the district court was wrong on saying Martinez didn't apply. I think it's pretty clear that it does apply, but I don't want, if the other judges feel the same way, I wouldn't want you to waste your time on that when there's other things to do. I agree with Judge Orloff. We think Martinez applies, so let's skip over that. I'd be happy to. And thank you. I appreciate the opportunity to talk about the other claim. So, again, the claim I think that I would like to focus on, if the court agrees, would be the ineffectiveness of Mr. Runneagle's counsel at his sentencing. And, of course, there's two steps to that. There's first the ineffectiveness of his post-conviction counsel, John Antio, in not raising this claim, and then second, the underlying ineffectiveness of Mr. Runneagle's trial counsel. Okay. Sorry, I wasn't sure if you were about to ask a question, Your Honor. Which claim are we talking about? It's Claim 1. I think in these proceedings it was Claim 17 below. Okay. It's actually, I think it's a combination of several sub-claims of Claim 17 as it was raised in the habeas petition because previous habeas counsel had divided it up into ineffectiveness for failing to investigate ineffectiveness. Is it 15 or is it 37? I don't know. It's 17. Let's call it what it is. Is this the failure to investigate and present mitigation evidence? Yes, Your Honor. Okay. Let's talk about that. Claim 17, page 25 of the district court's order, right? Yes. Right. Yes. Yes, Your Honor. So as an initial matter, it is clear from the record in this case that Mr. Antio provided deficient performance in this case. When you look at what was done during the post-conviction proceeding, Mr. Antio received funding for an investigator but never contacted her and did not have the investigator do any work on the case. He mentioned in a pleading that he needed a guilt phase investigator, which he never hired, and he did receive a limited amount of funding from a mental health expert. The mental health expert reviewed some documents, told him that he needed additional funding. The trial court wouldn't provide that additional funding, and that was the end of that issue. Mr. Antio did not do any kind of investigation outside the record as far as any other factors in this case. He did not speak to any of Mr. Running Eagle's friends and family members. He did not attempt to obtain any records. He did not do anything in investigating the mitigation in this case beyond the mere retention of that mental health expert. That was the only thing that was done in this case as far as developing the mitigation that had been done by trial counsel. So here, that's clearly below the standard of care for these cases. It was below the standard of care that what had happened at trial as well. So the fact that Mr. Antio did not even attempt to do any of these things, and then now the fact that once those things have been done and we have discovered the abundant mitigation evidence that was never presented below, that is enough to overcome the cause and prejudice finding here for Martinez. You talk about the abundant mitigation evidence that was not presented below. I see the mitigation evidence that you call abundant being principally three points. One, that the new psychologist or the last psychologist finds that the petitioner has an anxiety disorder with, quote, post-traumatic features. I don't see that that is a diagnosis of post-traumatic stress disorder, but I get the word post-traumatic features as novel. That's new. That was never mentioned by the two psychologists who examined him before. Secondly, he says that there was an improper diagnosis of antisocial personality disorder because the enigmatic reactions of Mr. Running Eagle were due to his education not to show emotion rather than what the trial judge found to be sort of a disdain for humans other than himself. And third, also new, was the notion that Native Americans, or sometimes called Indians, present more subtle post-traumatic stress disorders. Those are the three things that I find that are new. Is that the wealth of mitigation evidence that you're referring to, or have I missed something? Your Honor, I do believe that all three of those things are certainly new and very crucial pieces of mitigation evidence. Most importantly, of course, the fact that the two antisocial personality disorder diagnoses were improper and incorrect and relied upon very heavily in the special verdict. However, when you go back and look at the sentencing memorandum that was filed by counsel, the handful of witnesses that were presented at the sentencing proceeding, while there were a few mentions of some details such as the alcoholism of Mr. Running Eagle's parents, Mr. Running Eagle's alcoholism, some bare mentions about his childhood of abuse and neglect, the mentions that were made at sentencing were nowhere close to the amount of evidence and the information that was available. And I think you can tell the difference in what was presented to the trial court as to Mr. Running Eagle versus what was presented to the trial court for Mr. Tilden, because more information was provided about Mr. Tilden, which allowed the court to have some context in evaluating his conduct. For Mr. Running Eagle, when you look at the special verdict where the trial court judge talks about the mitigation, she actually found that none of the other things that had been presented to her constituted mitigation. She did not find any of the information provided by the witnesses coming from the letters gathered by Mr. Running Eagle's mother. She found none of that to be mitigation. The only mitigation she considered as to Mr. Running Eagle was the statutory mitigation of his young age at the time of the crime. Nothing else was considered in the weighing of the mitigation against the aggravation. Nothing else was found mitigating. It was considered but not found mitigating. Not found. Correct, Your Honor. And many of the things she did not even mention in the special verdict. Well, the fact of the abusive childhood was mentioned in the pre-sentence reports, was it not? Your Honor, it was to some extent, but it was presented along with incorrect information where the pre-sentence report writer talked about things like the fact that Running Eagle had an excellent relationship with his mother and father and that his childhood was mostly good. All of the things that are not correct, if counsel had done any investigation at all, he would have known those things. But it was mentioned that his father was an alcoholic and they were abusive as to him and he started drinking when he was 11 and became a full-fledged alcoholic when he was 16. That was all mentioned in the pre-sentence report. It was mentioned, but I would also remind the Court that there is a case from this Court that has already held that information contained in the pre-sentence report is not considered mitigation that can be credited to the trial lawyer for presentation. In one event, that mitigation information did not come from Mr. Running Eagle's counsel to the pre-sentence report writer. He obtained it himself. And so that is not the same as having an advocate for the defense do the constitutionally necessary investigation and development of mitigation evidence to present on behalf of the petitioner. The pre-sentence report writer is an employee of the Court, not a member of the defense team. So the mere fact that the pre-sentence report writer did mention the fact that Mr. Running Eagle had a drinking problem or that his parents did... In determining whether the evidence you proffer now is simply cumulative, does it matter whether the evidence that already was presented was developed by counsel or developed by Mr. Running Eagle himself? Yes, Your Honor, I think it does. The Lambright decision from 2007 specifically discusses a similar situation and finds that, again, that the information in the pre-sentence report is not attributable to counsel. And... It's not attributable to counsel, but on the question of whether this evidence is cumulative, if the evidence is already in the record, does it make any difference from whom it came? Your Honor, I think it does, because, again, I believe that there is a defense function here. Mr. Running Eagle had the right to have his lawyer present actual evidence of the mitigating circumstances in his case to the trial court. But if he presents it himself, what's the prejudice? If it was presented? Well, I think the prejudice is because of the way it was presented, Your Honor. This was a bare statement in a pre-sentence. It was qualitatively different from what could have been presented? I believe so. Why don't you concentrate on the qualitative difference of the proffered mitigation evidence and that which is already in the record and before the sentencing judge? That would help me. Absolutely, Your Honor. I think the qualitative difference is extreme in this case. I think when you look at a pre-sentence report that says, you know, that Mr. Running Eagle had a good childhood or he had a good relationship with his parents for the most part, and you look at the actual record that has been developed at this stage... No, but please tell me, if you would, Ms. Garcia, if the pre-sentence report talks about an abusive childhood, don't tell me about the portion of the pre-sentence report that talks about a good childhood, the abusive childhood. How is that different from what you're presenting now? Because of the qualitative difference in the evidence, Your Honor. I think that's what he's trying to get at. What is the qualitative difference? The qualitative difference here is when you look at the individual facts in support of that allegation. This is not a case where you can just say, Mr. Running Eagle had a dysfunctional childhood and have that be the end of the matter. Mr. Running Eagle grew up in extreme neglect and poverty. He did not have food on the table a majority of the time. He was surrounded by adults who were dysfunctional, abusive. He himself witnessed numerous incidents of domestic violence. He was surrounded constantly by adults that should not have been responsible for the care of a child, including bikers who at one point apparently got him high on marijuana when he was just a toddler. The declarations from the various fact witnesses in this case make all this very clear. Well, the extreme neglect and poverty was mentioned in the pre-sentence report, and so was the fact that the adults surrounding him were bad actors. In fact, his father was said to be an alcoholic. So how is your proffered evidence different from this? Again, I think it's the quality of the evidence. What is the difference in quality? The difference in quality is the detail and the fact that what a lawyer is supposed to do. What you're saying is that talking about the quality of the evidence is that his lawyer didn't do his job. He didn't go out and he talked to the parents. He said, I'd like to have a letter. He didn't discuss it any further, what was needed in the letter. Right? Absolutely, yes. And he kind of limited himself, had the impression that he wasn't aware that he could go outside the record and obtain further evidence from psychologists and others that would really tell the story behind what was behind his life. Yes, Your Honor. And how he grew up and how he was neglected, how his mother would leave him in a car while she went in to bars and drank for long periods of time. And his mother was an addict. Is that right? Yes, Your Honor. And so he'd be in a car. When he left it home, there was nothing to eat. And the kids would get a hold of vitamin C pills and eat those because they were hungry. But the lawyer made no attempt to go into any of that background. That's what you're talking about. Exactly, Your Honor. And the role of defense counsel is to bring out exactly those details, the previous details I mentioned. The role of defense counsel is to see. That's why I asked you those questions about what his experience was. Yes. And this was his first death penalty case. Yes. Did anyone sit down with him and tell him what you need to do in a death penalty case? Your Honor, there are documents in the record. I don't have the ER site right in front of me, but I can give it to you, that we provided from the Arizona Capital Representation Project, which is a nonprofit agency that assists with capital cases. It existed at the time of the trial. And they contacted Mr. Iniguez and provided him with a fairly large stack of materials that discussed his duties as capital counsel, what he needed to do to investigate mitigation and develop a social history. It discussed hiring a mitigation specialist. It laid out. I would say there's probably 50 pages of documents that they provided. He had an opportunity to hire an investigator, and I think one was hired, but he never used that person. The trial counsel had an investigator. He had a guilt phase investigator. Her name was Gloria Castillo. And there is a declaration from her in the record as well that says that she did try to get Mr. Iniguez to do some mitigation investigation. That's right. And he did not want to do so. He declined her. Okay. Let's assume his performance, Iniguez's performance was, Iniguez, I guess, was deficient. Do you have to establish stricter prejudice at both the cause and prejudice issues here to have the failure to raise the claim be excused? Your Honor, I think that that is a question that isn't quite settled at this point because of competing decisions from this court. If you look at the decisions that have discussed exactly that issue, there is the Dietrich decision from the en banc court, the Dickens decision from the en banc court, and then the Claiborne decision from a panel of this court. And that decision, actually, the petition for rehearing en banc that was filed was stayed pending McKinney, and I think the stay has not yet been lifted. So we are not, at that point, the status of that case is not entirely clear. But the Claiborne court said that in order to reach the merits of the underlying trial ineffectiveness claim that you were required to show strickland cause and prejudice for the PCR lawyer. And I think Mr. Running Eagle can do that based on the strength of the underlying claim. However, when comparing the analysis from the Claiborne court to that of the court, the en banc court in Dickens and Dietrich, it doesn't really make sense. I think that really the idea that you have to show that the PCR claim, had it been raised, would change the outcome of the PCR before you get to the step of deciding whether that underlying claim was also substantial or had some merit, really is, it's very redundant. I mean, the idea that you have to show all of that for the initial cause step really eliminates the purpose of the prejudice step at that point. So I certainly do think that the better test is the one that was put forth by the court in Dickens about the finding. But to get through the Martinez cause and prejudice gateway to say both that counsel was deficient under Strickland and that the underlying claim had some merit, that it was substantial, to then reach the merits of the underlying claim, certainly seems to be the most logical. But if the court is bound to follow Claiborne, it's certainly... I don't know if we're bound to follow Claiborne yet, but Claiborne was interpreting a tricky plurality of Dietrich. So there's a lot of questions about that. If you do have to show Strickland prejudice, how would you show it? I think that the Strickland prejudice then would be, if the question is as enunciated by the Claiborne court, that the claim, had it been brought in PCR, could reasonably have changed the outcome of the PCR, I think when you look at this claim, it certainly meets that test. I think just the fact alone of the erroneous antisocial personality disorder diagnoses and how heavily they were relied on. How do we know that that one was erroneous and the one 20 years later was correct? It's very clear, Your Honor, I believe, when you look at what those doctors had before them to rely on. This court has numerous decisions on this issue and the role of counsel was well-defined at the time, that counsel is required to provide experts that are evaluating their clients with supporting documents and background information. And in this case, Dr. Bayless had nothing before him. He only had his interview that he conducted with Mr. Running Eagle. And Dr. Enos had only police reports that he had been given by the prosecutor and not by defense counsel. Neither one of them had the benefit of any kind of childhood history medical records, which in this case are voluminous. They didn't have school records, employment records, information about his social history, his juvenile record. They didn't have any of the things that are necessary to make an informed decision about diagnoses and a defendant's mental health. And that's simply deficient performance. That is not a thing that is acceptable under the standards for capital counsel. So certainly that calls into question, that fact alone calls into question those two diagnoses. But the fact that every doctor who has seen him since has clearly repudiated that finding when they have had the benefit of the additional information, I think is persuasive. And his co-counsel, I mean the counsel for the co-defendant, took care of all that. Yes, Your Honor. He did all that. Absolutely. He did his job properly. The other fellow was just asleep. Absolutely, Your Honor. Did nothing. We need this, and without any discussion with the psychologist, as to what was important, what was needed, or any background information. Just like handing them a piece of paper here. We need this. Yes, exactly, Your Honor. And I think that is the thing about this case that is somewhat unique, in that we are able to look at the counsel for the co-defendant and see the very vast difference in the quality of representation. But wasn't it also, I mean, in terms of the evidence, I mean it is looking at who did what, and the physical evidence linking Red Eagle as opposed to Tilden, to the actual stabbing. It was his knife. He had it. His fingerprint. I mean, there is so much more evidence suggesting relative culpability for the crime against Running Eagle. I think you need to deal with that. Your Honor, I don't disagree. I do think that the trial judge especially found a vast difference in the conduct of the two at the time of the special verdict. But I think there are some things that do go against that finding. For one, it was testified to at trial by Mr. Antone and discussed by the medical examiner that Corey Tilden had actually struck the first blow by hitting the male victim in the head with a flashlight. And the medical examiner testified that that was, in fact, a fatal blow as well. So it certainly was not a situation where Mr. Tilden simply stood aside while Mr. Running Eagle was involved in this. Who are you talking about? Are you talking about Mrs. Williams or Mr. Williams? I believe it was Mr. Williams, and he was in the driveway. And Tilden struck Mrs. Williams in the head with the flashlight, but the coroner testified that it was actually the stab wound that was the fatal wound. I think that there was both. I think that you're right, I'm sorry, Your Honor, that I misspoke, that it is Mrs. Williams that was hit on the head with the flashlight, but that that wound could also have been fatal, the one with the flashlight. But it was, what you testified to was it was a stab, and it was, I think there was no dispute that it was Running Eagle who had the knife. Your Honor, I'm not sure I could quite agree with that, because the knife that Mr. Running Eagle was known to have was found to be consistent with the crime, but was not found to be the actual murder weapon. So I'm not sure I would say that it was undisputed, but certainly that was the evidence that was put forth at trial and that the trial court found. Okay, so we don't defer at all to the facts as found by the state court, the high state court, which we incorporated in the last opinion we wrote? No, absolutely, Your Honor. And I'm not suggesting that, again, I agree that the evidence at the trial certainly did indicate, especially to the trial judge, that Mr. Running Eagle was the actual killer as far as committing the stabbing. But I think when you look at the contemporaneous conduct of Mr. Tilden, who was also involved in committing violence, was also involved in the attack on the victims, even if he wasn't, as found by the trial judge, to have been the actual killer, he was very intimately involved in this case. And in addition, Mr. Tilden was the, of the two defendants, he was the one that had a violent history. He had had numerous prior, several prior convictions for things that constituted violent conduct, had attacked other people, and none of that was true of Mr. Running Eagle. And because Mr. Running Eagle did have a very similar history growing up to Mr. Tilden, and because Mr. Tilden's conduct did indicate that he was, if nothing else, a major participant in this crime, I don't think the difference in who actually did the stabbing would have been enough to say that there is, that there is not a reasonable possibility that had the trial judge had all the mitigation evidence that has been presented to this court and the court below regarding Mr. Running Eagle and his conduct, that he, this outcome of the sentencing could not have been different. That's the core of your argument. Yes. Yes, Your Honor. If there's no further questions, I'd like to reserve my remaining time. You may do so. Thank you. May it please the Court, my name is John Anderson, representing the respondents. First, the Court has already indicated it's not interested in the argument that Martinez doesn't apply. We've made the argument in our briefs. I believe the district court was correct. There was a proceeding by which an effective assistance claim could be prepared during the appeal. It could be presented on appeal. It's actually done here. You look at the systematic system under Trevino, and this system was You've preserved it. It's in your briefs. You've already indicated we don't want to hear argument on that. So maybe you should go to something that's more important. I made my pitch. And we're not concerned on issues number two and three, so it's all a question of ineffective assistance in presenting the mitigation. That seems like a pretty serious claim. Yeah, that's obviously the most contentious claim. First, I would like to say that with regard to whether Mr. Antrio is deficient in his performance, I would point out that that was presented in the third PCR as claim 37 and presented in habeas as claim 15. It was actually denied on the merits in claim 37. I thought it wasn't. It was denied procedurally. I thought the other two had the alternative merits holding. I'm not sure. Maybe you can point me to it. It was alternatively denied on the merits. It's in the ERs at 290. It's claim 37. It says the following claims are precluded, and the court further finds that none of them are colorable, which is a ruling on the merits under this Court's previous ruling. So there was a decision on that. It was presented in habeas. Which court are you reading from? It's in the ERs 290. I know, but which court decided that? That's the third PCR proceeding, Judge Cole's ruling. I thought it wasn't. Counsel, will you keep your voice up? You seem to grumble down. Yeah, sorry. I'll raise the microphone. I've just got a little bit of dry voice. I'll try to keep my voice up. But it was raised in the third PCR, which there were many claims raised. And if you look at the first paragraph, numbered paragraph of that ruling, claim 37 was a claim that counsel is in effect of? Which counsel? Antio? Appellate counsel Antio. And if you look at how it was presented in claim 15 in the habeas proceeding, it was presented as counsel Antio was in effect of both on appeal and during the PCR proceeding. And that was raised. They got a COA on it, and they did not raise that to this court previously. So I would argue that that's been decided and abandoned. I just wanted to point that out to the court. Secondly, when you look at whether Antio was in effect of or not, he's essentially serving as appellate counsel because the first PCR is part of the appellate proceeding. So whether or not Mr. Antio is deficient, you have to look at his total performance during the appellate proceeding. And I would assume that that wasn't deficient because he did raise some good issues. Matter of fact, three of the issues that he raised were three of the four issues that were decided by this court in the previous appeal. In effect of assistance and not arguing for severance, in effect of assistance in not protesting a joint sentencing, and the issue of misconduct during oral argument by the prosecutor. So they weren't bad issues. I mean, he raised three out of four issues that were raised by the federal public defender to this court on the prior appeal. So when you look at whether or not Antio was deficient, you have to look at his overall performance during that proceeding. Well, why did he have to do that? They start out, and you make a lot of mistakes. Because that's the thing. You know, indicates you're not quite sure what you're doing, but then as you go on, you're doing better. So we should look at everything. Well, under Evans versus… You know, you start out on the wrong foot. That kind of creates, oh, I don't know, certain impressions. And it starts to have the trier effect, thinking along different lines. I don't understand that argument. Well, under Evans versus Lucy and Jones versus Barnes, when you look at an effective system of appellate counsel, they don't have to raise every claim in the world. You look at whether the claims that they raised were reasonable, and I would argue that what Antio raised during the combined appellate proceeding was reasonable, as shown by the fact that three or four of those claims came up all the way to this court at a later proceeding. The fact that there are other claims that he could have presented doesn't mean that what he did was deficient. That might go to prejudice, but it certainly doesn't go to whether or not Antio was deficient. But I just wanted to make that point before I proceed on to whether or not Mr. Enigas was deficient during the sentencing proceedings. The first question is, was what he did reasonable? It's not what the best attorney would have done. It's not what another attorney would have done. It's whether what he did was reasonable. And at sentencing, he did present several witnesses. He cross-examined some of Tilden's witnesses who were part of the same family. I mean, Marlene Tilden is his aunt, so a lot of times Tilden's witnesses were very favorable to Running Eagle, so there were something like 10 witnesses that were presented at the sentencing hearing by Mr. Enigas. And he also presented, and I've included them in the supplemental excerpts, some 15 letters that were presented from family members, from reverends, from people that Running Eagle helped, from the Scottsdale Community College. Suppose we conclude that Running Eagle's counsel performed deficiently by not fully investigating, and the mitigation evidence, which we can't reject the use of it until he's at least adduced it. What's your argument as to prejudice? Yes, Your Honor. My argument as to prejudice is, first, I think this Court has a pretty recent decision in Andrews v. Davis, which explains how to analyze the prejudice component. First, you look at what was presented and what could have been presented. And I think that's pretty clear from the record, what was presented and what could have been presented. Secondly, you look at the aggravation, that was an aggravating circumstance that existed in the case. In this case, there were three aggravating circumstances. And what could have been presented if defense counsel would have presented more. For instance, if the defense had gone out and gotten a mental health expert that might have been more favorable, which is speculative at this point, that that expert could have been obtained. But the state probably would have gotten its own mental health expert at that point. But because there were mental health experts that didn't raise a question, the state didn't go out and get its own mental health expert. So that's one of the things you have to look at, was the possible rebuttal that the state would have presented if different mitigating evidence would have been presented. And then you look at the overall effect of the evidence. Was it cumulative? And I think Judge Baez's questions went to whether or not this was actually pretty much cumulative to what had already been presented. And I would argue that it was, because his family history was pretty well developed. I mean, Running Eagle himself tried to put a better spin on his family history than maybe came out later through Desiree Tilden's declaration, for instance, in the habeas. But, you know, it did come out that he was poor, he was beat up, he was bullied, had health problems. They moved around a lot. His parents were alcoholics. So I don't think the picture changed significantly about his childhood between what was presented at sentencing and what was presented later both in the third PCR and the habeas proceeding. Did you have a question, Judge? I have questions coming. So one of the conundrums on this is, and you mentioned it, that Tilden and... weren't they half-brothers or something? They were actually cousins. They were cousins? Okay. But they were pretty much raised together. So it's troubling that Tilden... Tilden's still serving his sentence, is that right? He got life. I think his proceedings are final. Well... I mean, I think he's been through his habeas. But he's still serving. He got life. He still has a life sentence, yeah. Was it two consecutive lives? You know, that's a good question, I believe, so I didn't really focus on... I can try to look at the sentencing proceeding, but as far as I know, he's still in prison. But I think, Judge... So we're trying to say, okay, what accounts for the difference in how Tilden got life and Running Eagle got death? Well, I think it's pretty clear, Your Honor. I think Judge Ybarra, in her sentencing special verdict, testified that the reason that she gave Running Eagle death was that he was the actual killer. I think counsels misstated the record in saying that the blow to the head was the fatal injury. Dr. Bullock's testimony was actually that it could have been a fatal injury after a couple of hours, but she was stabbed in the liver, which was an immediately fatal injury. So he was, in fact, the killer of Mrs. Williams, and Mr. Williams died of stab wounds as well. So he was the actual killer. This has been found by the sentencing court, the Arizona Supreme Court, and this court in the prior appeal. So that's one of the main things that Ybarra relied on. Another thing that he relied on was that Running Eagle was the leader, and I think it's clear because it was his car, he was driving around, he was looking for parts for his car, he organized the burglaries. And the other thing was that he just wasn't lacking in remorse. I mean, he claimed he didn't do it, so that's why he wasn't remorseful. But also, as Ybarra pointed out, he relished the murder. He came out laughing. After the murders, he was laughing. And also, he told his girlfriend, Cheryl Sivertson, that he hit them full force. They had a good fight, and he hit them full force, which Judge Ybarra found to be relishing. So it's not the lack of remorse so much, it's the actual relishing, and that's inconsistent with his new evidence that Native Americans don't show their emotions. But in this case, he certainly showed his emotions. He was laughing after the murders, and he was bragging to his girlfriend that he hit these people full force. Counsel, there was no mention at all in any of Velas or Enos or the third one whose name I can't remember of the term PTSD. Is there any evidence at all proffered now of a traumatic event which would be causally related to the condition of PTSD? Question number one. Number two, is there any diagnosis of PTSD? There's not as far as what caused the PTSD. If you look at, I think it's just generally that his childhood caused the PTSD. And I'll get to your second question in just a minute. But there's no triggering event. I mean, if he was beaten as a child, why would he kill these two people in their home? I mean, they're not really related. But if you look at Dr. Hill or Enos. Didn't we just reiterate that you can't apply a causal nexus test? Oh, well, that's the McKinney issue, which I don't think has been raised here. But if you look at. She actually found that his drunkenness on the night of the deaths was causally related. I mean, she made a finding the other way around. Right, so I think it is. She didn't exclude it. She considered the drunkenness on the night. But there wasn't, I guess, evidence of PTSD put in front of her. Right, that's true. And I would argue that there's still not evidence of PTSD because Dr. Hiller's report is very equivocal, starting in the excerpts of the record at 327. I mean, you can look at several points. I mean, he obviously has a high IQ. But going to the PTSD, it should be noted there is no adequate test of PTSD known for Native Americans. So what he's saying is I really can't make a PTSD diagnosis with regard to Ernie Eagle because I don't have that information with regard to Native Americans. Later on, he says, Sean does not present with typical PTSD symptoms. And this court said a couple of times in Rhodes and in Bible v. Ryan that this kind of equivocal PTSD later evidence really doesn't add much, if it's even a diagnosis of PTSD. I mean, I think at the end Dr. Hiller kind of says that. He says, in conclusion, he has an anxiety order, not otherwise specified with PTSD features. So I would argue there's not even a solid diagnosis of PTSD that would really change anything that was presented. With regard to other things, there are three. This takes on many forms, post-traumatic stress disorder. We're learning a lot about it. We learned a lot about it the past 50 years. So you're saying that we don't have any studies on post-traumatic stress disorder vis-a-vis Native Americans? That's what Dr. Hiller said. Are they different from anyone else? Well, I mean, there was some testimony all through the proceedings that Native Americans may be a little more stoic than non-Native Americans. But I would argue that wasn't true. It's hard to believe. Well, I don't know. I'm not an expert on Native Americans. But to the extent that there's testimony from Native Americans in this case, that they tend to be more stoic, that may or may not be true. But I think you have to look at Mr. Running Eagle in particular. Well, you can be stoic and still be suffering. Oh, sure. Maybe that helps you get through the suffering. I think you have to look at Mr. Running Eagle in particular. Was he stoic? No. He laughed. He laughed after the murder. Well, that's kind of a crazy reaction for someone to laugh after a murder. Well, it's not crazy for someone who relishes the murder and thinks that it's a humorous event. Which goes along with the antisocial personality disorder, which was found by Dr. Enos and Dr. Bayless and, to some extent, by Dr. Markey. But what's that all got to do with ineffective assistance of counsel? His lawyer didn't go out and do very much to assist these experts or tell members of the family, you know, this is what you need to focus on. Prepare them. What the role is? I think the reason that Enos and Bayless and Markey came to their conclusions was that they found him to be a highly intelligent young man and they saw no signs of any mental disorder. And counsel didn't have, under Earp v. Arnowski in some of this Court's cases, counsel can reasonably rely on the contemporaneous findings, which tend to be more accurate than later findings, that there wasn't any kind of mental health evidence that would have really helped him. And one thing I want to point out, appellant's counsel has talked about... What was the contemporaneous finding? The contemporaneous experts were Enos and Bayless. They were closer to the time of crime. They didn't get any basic information from the lawyer as to what the situation was all about. Well, they got enough... They just... How did he deal with those two experts, Bayless and Williams? What did he tell them? Who did? Counsel? Counsel. Well, counsel asked for appointment of experts pursuant to Rule 26.5. Yeah, but after they were appointed, what did he do? That's not in the record. I mean, that they felt confident enough. They were appointed by the Court. Well, we're not limited to the record, are we? I think so. I think you're limited to what is in this record. You're talking about the trial record? No, I mean, when you consider prejudice, you look at what was presented, you look at what could have been presented, as comes out in the PCR proceeding, and what was presented in feral habeas. Yes. Of what could have been presented. What are the limitations on that? No, because, I mean, a federal public defender and a third PCR counsel were free to present whatever they could find in further proceedings, and they did present it as well. It depends on the competence of the lawyer, doesn't it? Well, I'm talking about prejudice now. The co-defendant had a much better lawyer. But that's not what's different. He had a public defender. But they're not necessarily. This defendant had someone who never tried a murder case before and apparently was given all kinds of stuff to read, to have him develop some expertise. But whether he read that or took it seriously or consulted with anyone else, we don't know. Well, the Supreme Court said, and I think it was chronic, that you look at what counsel did, not what their background was. I mean, you could have a corporate lawyer that does a good job. There's millions and billions of words out there you could look at that Supreme Courts have put out. We've got to think about this case. But the Supreme Court has issued a controlling law in this case where you look at what counsel did, not whether he was a corporate lawyer who had his first case. I mean, the Supreme Court said every lawyer has a first case. Mr. Steinle, he's a good lawyer, but he had a lot more to work with. He had a client with a lot less evidence against him. Well, it may be true. The other one apparently didn't do any work. Well, that's not true. I think he's done a lot of work. I mean, it's evident from his cross-examination at trial that he was aware of what the witnesses were going to say. We're not talking about the trial. We're talking about the sentencing. We're talking about whether the death penalty was more of it. I agree 100%. The only question is, under the analysis in Andrews, you look at what could have been presented, whether it would have made a difference. I mean, you have three aggravating circumstances here. Running Eagle was clearly a kill there. You never know what makes a difference in a trial. Well, I think Judge Ibarra explained it. That's the advantage of when you have these special verdicts in Arizona from a judge. The judge specifically explains what she's thinking, so you do know what would have made a difference. And during the first PCR, when John Antio got Dr. Bentheim and indicated that maybe antisocial personality disorder wasn't a proper diagnosis, Judge Ibarra said, well, I'm not interested in that. That's not the basis of my decision. So we do know what Judge Ibarra was thinking in this case, and she was the sentencer whose logic we have to look at. But we don't know what her thinking would have been had counsel done his job properly. Well, we can only know what the... We can only speculate. No, we can know what the judges did based on the record before them, which is all part of the record in this case. Well, that's not always true. That's not always true. It all depends on what the record is before them. I agree. If the record is not, doesn't have the information that the judge ought to consider, then we're just speculating. That's why we have habeas proceedings, so they can be further developed anywhere in this case. Habeas proceedings, they're not as effective as they used to be. Well, I think the federal public defender would no doubt disagree. I think they actually do an excellent job. Look, there's so many barriers put up to habeas proceedings today that it's almost very difficult to get a writ. Well, those are barriers to the extent they're barriers that were created by the Supreme Court. One point I'd like to move on to is the argument that because someone's appointed by the court, they're considered less important or that it's not. No, it wasn't that. The argument is that because it was court appointed, then the entire report was going to go before the judge who was going to be sentencing, so as opposed to getting a hiring one to a mental health expert not through the court, you can not have to produce that report if it comes out unfavorable. And in this case, there were two reports, and they contained some pretty unfavorable information about Mr. Brenningingel. Right. It's a gamble, Your Honor. But one thing I would point out, I think it's kind of insulting to mental health experts to say that their report depends on whether they're appointed by the court or retained by counsel. Well, it does. No, not that the quality of their report, but that you wouldn't have to disclose the unfavorable things, and both reports had unfavorable things. Had they been done by a private mental health expert, that wouldn't have gotten in front of the judge. Well, it's a gamble because, say, I think the court, if those appointed experts would have found that he had problems, the court would have considered them from being a more neutral source, would have given them more weight. So it was a gamble, and it paid off. But the truth, I mean, this is what the experts thought, that he didn't have any major mental health issues. I mean, he's a very intelligent young man. Look at Heller's examination years later. He's of superior intelligence in 17 out of 18 tests. The only one that he was below was mathematics, which a lot of lawyers suffer from that. But, you know, there are a lot of intelligent men who go out and commit heinous crimes. True, but it's that he had no cognitive, because he performed above average and superior level in 17 out of 18 cognitive tests, that indicates he has no cognitive problems. And as to the PTSD, I've already discussed the PTSD, and there were other equivocal evidence that went to the PTSD. I think Judge Bay, as you pointed out, that's really the different mental health aspect was the PTSD, and I would argue that there's no solid evidence of PTSD here. What is the state of capital punishment in Arizona right now? Do they not have the drugs still, or what's going on? Yeah, that's kind of a different issue. No, it's a different issue, but I want to know. Sure, I'm happy to talk about anything. Is this case back for an execution soon or not, if we were to affirm? Well, it's being litigated before—I forget which judge it's being litigated— but there is litigation pending. There's a 1983 pending on whether we can proceed. Certainly the— With respect to Mr. Running Eagle or with respect to— I don't think he's a member of the class, but— and, I mean, even if this court affirmed, this panel affirmed, I mean, there would still be a petition for a hearing, a cert petition. So there's several other death row inmates that are closer. I think there's about five or six that have actually been through the system. But you're right, it is a problem getting the drugs now, and that's being litigated at this time in a 1983 suit, which I'm not directly involved in that. We have some lawyers that handle that because it's complicated issues. The U.S. Supreme Court discussed in Glossop recently. Certainly Glossop helps us. But I think if we can get through that 1983 litigation, then we would have executions in Arizona. But, no, there's no warrants. There's nothing pending right now. Does he have any other collateral proceedings pending? Mr. Running Eagle? No, to my knowledge. No. I guess I would know about him since I'm the attorney for the state. Let's see if there's any other points I wanted to hit. Uh-oh, the yellow light's on, so I better start winding up. The yellow light, you have three minutes left. Okay, let's see if there's any other points. Oh, as far as whether Claiborne controls the analysis, I thought they had conceded that in their brief. Claiborne explains what's a very complicated decision in Dietrich. And Claiborne may be brief, but as another panel of this court found, Claiborne applies in Pizzuto v. Arave. And I recently cited in my supplemental citation an unpublished decision. So it seems to be the general rule of the circuit at this time. There's been no en banc ruling on that. But Claiborne clarifies what was unclear, and it does require a showing of prejudice. It seems kind of redundant to require that showing twice. I don't think it's twice, Your Honor. Let me explain why. As far as PCR counts, you have it in this very case, where is there any prejudice from counsel not presenting something? Well, in this case, some of the issues came up in the third PCR, and they were denied on the merits. So sometimes you can have no prejudice from deficient performance by ANTIO because in other PCR they were actually presented and addressed on their merits. So you don't have that problem. So I think there is a difference between prejudice going to Mr. ANTIO and prejudice going to Mr. Iniguez. I hope that answers your question. I think that's why there's a different prejudice problem. Besides, Strickland itself requires, before any counsel has found Strickland ineffective, you have to rule it wrong. So it wouldn't make any sense to have a different Strickland rule on PCR counsel than it does on appellate counsel and trial counsel. Does that kind of answer your question, Your Honor? Clareborn isn't final yet. No, it's not final, certainly. But it does seem to be the sense of the circuit. And I thought Appellant had conceded that point, but they're still making the argument. You know what makes sense in all this? You give somebody a fair trial. You make sure they've got a competent lawyer, particularly when they're appointed by the state, someone who's never tried a first-degree murder case and put them on it unless they've sat second chair, unless they've had other experience, because you've got a huge responsibility. And as I recall, and I think I'm right on this, I haven't looked into it, but to be a counsel in the federal system, if you're appointed before you handle a death penalty case, you've got to be very qualified. You have to be part of one of our panels for a significant period of time to show that you're a good trial lawyer, show that you've had experience in death penalty cases, and you're qualified to handle a death penalty case. That's the way to do it. That is now the standard in Arizona. Arizona has those exact standards now pertaining to trials. So they should have had them maybe back then. The question is whether the Supreme Court said you had to have them back then. Well, I mean, we're just talking just between you and me, right? Sure. I think we're on the record. Be careful. It's on YouTube. I won't tell anybody. It'll be on YouTube later. It's on YouTube. I'll try not to do anything outrageous. Well, I see I'm 22 seconds into the red, so we would urge the court to affirm the district court's judgment. Oh, you're over 30 seconds. You're over. I know. I'm out of here. Yeah. I didn't mean you're over. Okay. Thank you, Your Honor. I just would like to make a couple of just very quick points in rebuttal.  I actually meant to say this before when talking about the Dickens, Dietrich, Claiborne analysis. Who did you meet before? Excuse me? You said you met someone before. Oh, sorry. I meant to say this before. Oh, you meant to say before. Yes. I'm sorry. I noticed in preparing for this argument that the Claiborne decision came out six days prior to a decision by the Dickens en banc panel that the opinion would stand despite the fact that Mr. Dickens had passed away. I'm not sure if the court remembers the situation in that case, but once the en banc decision came out, Mr. Dickens unfortunately committed suicide a few days later. Respondents filed a motion in that case to vacate the en banc decision based on the death of the petitioner. That motion was pending for a little while. The Claiborne decision came out while that motion was still pending, and I believe five days later the en banc court in Dickens denied the motion and stated in the order denying that motion that one of the reasons why it was being denied was that future panels of the court should be guided by the analysis in that case, that vacating the opinion after all the work that had been put in would deny the benefit of that analysis to future petitioners. And that is something I do think is notable because of the fact that at the time the Claiborne opinion was written and issued, the furthering, the continued viability of the Dickens en banc opinion was still at issue until five days later. Just a couple other quick points. Mr. Anderson mentioned that Mr. Antio's performance could not have been deficient because several of the claims that were raised by him were the same as those litigated by us in the prior proceedings, but of course that's because the claims that were raised by him were the ones that were not procedurally defaulted in the earlier proceedings. So that wasn't so much a comment on the wonderful nature of the claims he raised as much as it was what we were left with as a result of the few claims that were properly raised in the first post-conviction petition. And second of all, Mr. Anderson filed supplemental authority discussing Andrew's case, and that case is distinguishable from this in several ways. First, it's governed by the AEDPA, and second of all, when it's discussing the evidence in that case that could have been presented, it included the fact that the petitioner had what they called a propensity for violence and a severe criminal history. That's not the situation in this case. The evidence that should have been presented to the sentencing court is not at all the double-edged sword type of mitigation that was under consideration in the Andrews case. If there are no further questions. I just have one question. So it was my understanding that the mitigation claim was denied procedurally but not alternatively on the merits. Is that right or not? That is correct, Your Honor. It's I think ROA 451, and there are several paragraphs to that order, and some of the paragraphs deny the claims alternatively and say first they were precluded and alternatively they were not colorable. And with regard to the sentencing IAC claim, that is not what happened. The court said even assuming that these claims are colorable, they're precluded. So there was no actual finding made that the claims were not colorable, unlike the other claims discussed in the order. Okay. I have that in front of me. Okay. Thank you very much. Thank you, Your Honor. Good job. Yes, very good job. Thank you, counsel, both counsel, for coming out here to argue this case today and Running Eagle v. Ryan will be submitted, and this session of the court is adjourned for today. Thank you.
judges: Pregerson, Wardlaw, Bea